NORMA J. CHEEK, ADMINISTRATRIX *v.* HOMER HAMLIN, ADMINISTRATOR.

[No. 671A105. Filed January 20, 1972. Rehearing denied February 28, 1972. Transfer denied February 7, 1973.]

*Alan E. Morrill, Roland Obenchain,* of South Bend, for appellant.

*Erle A. Kightlinger,* of Indianapolis, *George Beamer, Jr.,* of South Bend, for appellee.

LOWDERMILK, J.—On December 16, 1967, defendant-appellee's decedent, Jerry Hancock, together with his family, called at the home of Robert Eugene Cheek, now deceased, in the town of Osceola for the purpose of visiting with them. Later the two families went out together in two vehicles, stopped at a restaurant and had dinner and went to a bowling alley where some of the parties bowled and enjoyed the evening and then returned to Osceola to the Cheek residence.

There had been no drinking at any time during the course of the evening, at the bowling alley nor after the parties returned home, and neither had there been any evidence of any ill will or bad feeling between any of the parties and, in fact, they were very close friends and visited together often.

After returning to the Cheek residence it was determined that Cheek needed fuel oil and that from between the hours of 12:30 and 12:50 A.M. the parties left the Cheek residence in a Ford Ranchero operated by Jerry D. Hancock with an oil tank to purchase fuel oil with which to heat the Cheek home. They drove north along Long Avenue approaching the grade of the railroad tracks of the Penn Central Railroad

which runs in an easterly and westerly direction through the town of Osceola. The terrain through this town is generally level.

There are three sets of tracks, an industry track, an eastbound main line and a westbound main line track, with the westbound track being the northernmost of the three sets.

At the time Jerry D. Hancock approached the railroad tracks there was a westbound freight train approaching the crossing at a speed of 70 miles per hour en route from Logansport to the yards in Chicago. It struck the Ford Ranchero on the right side as it was on the northernmost, or westbound, track, having crossed two other sets of tracks, carrying it down the track several hundred feet, killing both of its occupants and throwing the body of Hancock out at the side of the tracks several hundred feet from the point of impact and carrying Cheek's body, pinned in the wreckage, to the point where the Ranchero fell or was thrown off of the front Diesel engine.

An estate was opened for each of the decedents and the first complaint charged Hancock with wanton or willful misconduct and charged the railroad company and its engineer with negligence in the operation of the train. Later the plaintiff-appellant dismissed as to the railroad company and the engineer and proceeded on an amended complaint for wrongful death under I.C. 1971, 9-3-3-1, Ind. Ann. Stat. § 47-1021 (Burns 1965) (the Guest Statute).

The amended complaint alleges facts similar to those related in this opinion and which amended complaint and answer were filed under the old Supreme Court Rule of admission and denial.

The evidence considered to determine if Jerry D. Hancock was guilty of wanton or willful misconduct was introduced, with the engineer and the fireman of the train testifying as the only known eyewitnesses, together with certain peace officers who investigated.

The train crew of Leo Grose, engineer, and Elmer A. Tutt, fireman, boarded the train at Elkhart about ten minutes before the accident, which boarding was about 12:30 A.M. on the morning of December 16th. The train had a double seal beam headlight, one below the other. At the time in question both of these headlights were operating. They would illuminate approximately 1,600 feet down the tracks, spreading out on either side thereof.

The engineer made the run between Elkhart and Chicago about 40 times per month, with general instructions to operate at 70 miles per hour, and he was following general instructions when he struck the plaintiff-appellant's decedent and Mr. Hancock in the Ranchero in the town of Osceola. The engineer, being on the right side of the locomotive, could only see to the left when he was not near a certain object or point and the fireman, riding on the other, or left, side of the cabin views the left side but has the same difficulty with obstructions on the right side of the engine when near to the obstruction and only the engineer can see that.

A whistle post for westbound trains was located approximately 1,000 feet east of the first crossing in Osceola, which was the county line and which is about 1,000 feet to the next crossing west from the county line, with the whistle stop for Osceola being 800 to 1,000 feet from the first crossing in Osceola as you travel west. The requirements are that the whistle be blown continuously through Osceola proper.

The westbound train would first cross Long Avenue, then Apple Road, and then Chestnut Street, with Chestnut Street being the one on the west edge of town. It is there that the continuous whistle is discontinued.

The engineer testified that he could see 125 to 150 feet possibly to the south but his view to the left, or south, would be obstructed if an automobile would be within 30 feet from the track the train was traveling on.

The engineer did see the Ranchero before it was struck and

saw it coming from the south with it was 125 to 130 feet from the track. It was light enough that he could see the lights on the vehicle and the vehicle itself by the lighted area in the town. The Ranchero was on Long Avenue. However, both the engineer and fireman were of the opinion that they struck this vehicle at Apple Road, but later investigation proved this to be error.

Both the engineer and fireman, Elmer A. Tutt, testified that the Ranchero never increased or decreased its speed. The engineer could see it over 100 feet before it became obliterated from his view and he struck the same. He estimated the speed to be in the neighborhood of 25 to 30 miles per hour.

The engineer testified his headlights were on; he applied the brakes at approximately the point of impact; however, when traveling at 68 miles per hour and you apply the brakes you begin to slow down after you have traveled approximately 100 to 200 feet.

The fireman indicated to the engineer that it looked as if the Ranchero was not going to stop and the emergency air brakes were set at that time.

There had been a continuous blast of the air horn from the time the train entered Osceola until it stopped. The horn was blown as loud as it would blow and intermittently changed from a long to a short blast, or anything to attract attention.

The evidence of Elmer A. Tutt, fireman, was practically the same as that of the engineer.

Donald Singleton, a county policeman, was on road patrol in December of 1967, when the fatal accident occurred at Osceola at Long Avenue. He worked this wreck, along with a Sgt. Russell. After receiving notice of the collision he had to drive a mile or a mile and a half to the point of impact and arrived there at 12:55 A.M., having been notified at 12:52 A.M. This police officer walked approximately 3,160 feet to the body of Jerry D. Hancock which had been thrown out of the motor vehicle. The Ranchero was approximately

3,745 feet from the point of impact and approximately 500 feet west of the body which had been thrown from the car.

The investigation included the taking of pictures, a part of which were introduced into evidence.

Identification on the bodies of the victims showed Mr. Cheek's body remained in the car pinned under the dashboard and Mr. Hancock's body had been thrown free of the wreckage.

The only discrepancy in the evidence is as to the crossing where the collision occurred and all witnesses, after having discussed the physical evidence and the facts with one another, determined that the accident happened at the north, or westbound, set of tracks on Long Avenue.

The evidence is practically conclusive on this as the gas tank from the Ranchero was found west on Apple and there were fresh grooves in the blacktop where the impact happened at Long Avenue.

The protective devices for the users of the public highway and streets at the Long Avenue crossing on the night in question consisted of a pole and cross arm. There also was an octagonal stop sign, as used by the State Highway Department, and also a bell.

The Goshen Road runs parallel to the tracks and is on the south side thereof and has an octagonal stop sign before one enters Long Avenue and then there is a pole with a cross arm on it and a telephone pole with a street light above it.

The stop sign on Long Avenue was south of the crossing and was north of Goshen Road. East of the Long Avenue crossing was some short brush, either on the railroad right-of-way or adjacent thereto, as evidenced by photographs. There was no foliage on the brush at that time of year and the brush appeared to be thin enough that light could shine through the same.

There was further evidence that the bell at the crossbuck warning rang as the train approached, but it was described

as a "tinkle" and may or may not have been audible to an approaching vehicle with windows closed.

The Penn Central tracks are constructed on a slight grade or elevation above street level at Long Avenue and generally through the town of Osceola.

Norma Cheek, widow of the decedent, plaintiff-appellant herein, testified that they had lived in Osceola nine years and had two children.

She and her husband, the decedent, were married in Georgia, where he was a saw-miller; they came to Chicago in 1954 where they resided eight years. The husband was employed as hydraulic mechanic. He quit that work and worked for himself, and then went back into the same kind of work. His income was modest, running about $5,000 to $6,000 per year. Apparently the decedent, Jerry D. Hancock, lived in about the same station of life.

The Hancocks, before the fatal crash, lived in Mishawaka, which is west of Osceola. Mr. Hancock's usual custom when he visited the Cheeks was to come into Osceola on Apple Avenue, go south across the tracks, then go east and pull straight up in front of the Cheek home. When he left he would be facing east and on most occasions he would just pull out north into Long Avenue, as the Cheek house was at the extreme end of Long Avenue.

The parties stipulated the following: the date of the fatal collision was December 16, 1967, with the train striking the Ford Ranchero at Long Avenue at about 12:50 o'clock; Norma Jean Cheek was the duly appointed, qualified and acting Administratrix of the estate of Robert Eugene Cheek, pursuant to appointment by the St. Joseph Probate Court on June 4, 1968; reasonable funeral and burial expenses for her husband was $1,464.40 and a bronze cemetery monument and marker at the cost of $518.56 and that the decedent was a white male, age 36, with a life expectancy of 34.76 years.

At the close of plaintiff's evidence plaintiff rested and, in

the absence of the jury, a motion for judgment on the evidence at the conclusion of plaintiff's case was granted and the issue was withdrawn from the jury and the jury was dismissed.

The court entered judgment that the plaintiff take nothing and the defendant recover costs.

In other words, this amounted to a directed verdict for the defendant at the close of plaintiff's evidence.

The plaintiff timely filed a motion to correct errors, which, omitting the formal parts, reads as follows:

"Under the provisions of Trial Rule 59, the plaintiff moves the court for an appropriate order for the correction of errors occurring prior to the filing hereof as follows:

"1. The court erred in withdrawing the issue of liability from the jury at the close of plaintiff's case.

"2. The court erred in granting the defendant's Motion for Judgment on the Evidence at the conclusion of the plaintiff's case.

"3. The finding and judgment of the court are contrary to the law, for the reason that there was sufficient evidence of probative value from which inferences could be drawn favorable to the plaintiff, that the defendant's decedent was guilty of willful or wanton misconduct at the time and place described in the pleadings, which proximately caused the plaintiff's decedent's death, i.e.: he drove through a stop sign without stopping, onto a railroad grade crossing into the path of an approaching train with its headlight lit and a horn sounding repeated warning blasts, which otherwise was plainly visible, with reckless disregard and heedless indifference to the safety of the plaintiff's decedent."

The motion to correct errors was overruled, the plaintiff appealed and filed a praecipe for a transcript of the record.

Plaintiff-appellant, in the argument portion of her brief, in general, admits the facts that the author of this opinion has heretofore set out; she insists that it is important that the defendant driver's conduct be viewed in the terms of multiple wrongful acts or omissions and that this is not a case of the driver performing one wrongful act, and her contention as to what the evidence clearly shows is as follows:

1. That the defendant driver approached the Long Avenue railroad crossing at a constant speed of 25 miles per hour. There was no decrease in his speed as he approached the railroad tracks.

2. That the defendant failed to stop for the stop sign which was present at the railroad crossing.

3. That the defendant failed to heed the warning of the train's whistle which was sounded repeatedly in a loud, shrill blast for a minimum of two blocks prior to the point of impact.

4. That the defendant failed to heed the warning of the buzzer present on the cross-arms or cross-buck at the railroad tracks on the night of the acident.

5. That he failed to see or heed the warning of the headlights of the approaching train as they shone brightly down the tracks that evening.

6. That he failed to stop or slow down his automobile before proceeding over the railroad tracks.

7. That he either failed to look and see the approaching train, or, if he looked and saw the approaching train, he attempted to race the train to the crossing.

Many cases have interpreted the test for willful or wanton misconduct under our Guest Statute and in the case at bar dozens of cases have been cited and relied upon by the respective parties.

Plaintiff-appellant further cites the case of *Clouse* v. *Peden* (1962), 243 Ind. 390, 186 N. E. 2d 1, wherein the Supreme Court set forth the elements of willful or wanton misconduct as follows:

> "To be guilty of wanton misconduct within the meaning of the statute, the driver must (1) be conscious of his misconduct; (2) be motivated by a desire to assert himself or his interests above or beyond, or in reckless indifference for, the safety of his guests; and (3) he must do so knowing that his conduct subjects them to a . . . probability of injury."

She further cites the citation of the three elements cited in *Clouse* by the Indiana courts through the years as follows:

"These same three elements have been cited with regularity by the Indiana Courts through the years. *Schwing* v. *McKibbin* (1970), 148 Ind. App. 222; 264 N. E. 2d 629; *Brueckner* v. *Jones* (1970), 146 Ind. App. 314; 255 N. E. 2d 535; *Mazza* v. *Kelly* (1970), 147 Ind. App. 33; 258 N. E. 2d 171; *Tuttle* v. *Reid* (1966), 247 Ind. 375; 216 N. E. 2d 34; *Reynolds* v. *Langford* (1961), 241 Ind. 431; 172 N. E. 2d 867; *Clouse* v. *Peden, supra; Sausaman* v. *Leininger* (1957), 237 Ind. 508; 146 N. E. 2d 414; *Hubble* v. *Brown* (1949), 227 Ind. 202; 84 N. E. 2d 891; *Hoesel* v. *Cain* (1944), 222 Ind. 330; 53 N. E. 2d 165; and *Bedwell* v. *DeBolt* (1943), 221 Ind. 600; 50 N. E. 2d 875.

"As the Court indicated in *Andrews* v. *McNaughton* (1967), 141 Ind. App. 1, 226 N. E. 2d 167, the rule with respect to willful or wanton [misconduct] under the Guest Statute is well established. The difficulty is only in applying the changing factual situation to the established precedents. In *Schwing* v. *McKibbin* (1957), (sic) 148 Ind. App. 222, 264 N. E. 2d 629, the Court discussed the guidelines for evaluation of Guest Statute cases based upon the rules as set out in *Brueckner* v. *Jones* (1970), 146 Ind. App. 314, 255 N. E. 2d 535. The Court indicated that among others, the following guidelines would be helpful in evaluating such cases:

"1) Error in judgment or mistake alone on part of host not willful and wanton.

"2) The host must manifest an attitude adverse to the guest or of perverseness in that the host must have shown that he was indifferent to the consequences of his conduct.

"3) That the entire course of conduct of the host leading up to the accident must be considered.

"4) That the host must have had actual knowledge of the danger confronting his guest. (20 Ind. Dec. 315, 255 N. E. 2d 535)."

There are many further cases cited by plaintiff-appellant with facts which would appear to be similar in each case and in which the trial judges went separate ways in the cited cases. The facts in the case at bar are similar to the facts in many of the cited cases. Our appeals courts of this state

have refused to disturb the trial court's ruling in many of the cited cases. From a reading of and considering the cases discussed in the briefs, as well as those many, many cited in the table of cases set out in the briefs, we have come to the inescapable conclusion that the courts of appeal, when possible, apply the test or rule that in every case where possible the weighing of the evidence should have been left to the jury.

We are of the opinion that, as the saying goes, "Every tub must set on its own bottom." In other words, each case involving willful or wanton misconduct must be decided and must turn on the circumstances as shown by the evidence to be particularly peculiar or unique to the case. Every act entering into the particular transaction must be considered and weighed in connection with all the other circumstances.

In *Brown* v. *Saucerman* (1957), 237 Ind. 598, 145 N. E. 2d 898, a guest case, the court held the burden was upon the appellee to show by a preponderance of the evidence that appellant was conscious of his conduct:

" '. . . and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries.' *Bedwell* v. *DeBolt* (1943), 221 Ind. Ind. 600, 607, 50 N. E. 2d 875."

The court, in *Brown* v. *Saucerman, supra,* said further:

"The rule by which we are guided in determining whether the evidence as above summarized is sufficient to sustain a charge of wanton or willful misconduct under the guest statute is reaffirmed in *Miller, etc.* v. *Smith* (1955), 125 Ind. App. 293, at page 299, 124 N. E. 2d 874, 877, as follows:

" 'Because of the difficulty of defining with precision the terms used in guest statutes to describe . . . misconduct for which the owner or operator is liable, in determining whether particular conduct falls within such terms each case must be decided on the circumstances peculiar to it; every act or omission entering into the particular happening must be considered and weighed in connection with all the

other circumstances, and in arriving at such decision the consequences of one's conduct as well as the conduct itself may be determining factors, . . .' 60 C.J.S., *Motor Vehicles*, Sec. 399 (4) f. page 1007; *Sheets* v. *Stalcup, supra* [105 Ind. App. 66, 13 N. E. 2d 346]; *Pierce* v. *Clemens* (1943), 113 Ind. App. 65, 46 N. E. 2d 836."

It was appellee's contention in the *Brown* case that appellant was driving with speed so excessive as to constitute wanton or willful misconduct. However, the court held in that case that the question as to whether speed alone is sufficient to establish wanton or willful misconduct is one of first impression in this state; but that other states having a similar statute have held that excessive speed alone is not sufficient to prove wanton or willful misconduct and cites cases from Ohio, Michigan, Wyoming and Pennsylvania.

Indiana then adopted the Wyoming rule, in *Meyer* v. *Culley* (1952), 69 Wyo. 285, 241 P. 2d 87, which held that generally speed in and of itself did not constitute "willful misconduct" yet there may be a point where the speed became so excessive that the danger of injury to a guest was probable at such extreme speed and that this might constitute "willful mis-conduct". The court further held that it was, needless to say, the circumstances appearing in each case that must rule this point.

The case at bar is not one in which speed or speed standing alone controls, but the citation is given for the purpose of clarification as to other acts which may constitute "willful mis-conduct".

In *Brown* v. *Saucerman*, the court said:

"We recognize that 'When one by a continuous course of conduct seems to exercise no concern for others he may be both willful and wanton.' *Kahan* v. *Wecksler* (1938), 104 Ind. App. 673, 678, 12 N. E. 2d 998, 1000.

"However, there is no evidence in the record here that shows any 'continuous course of conduct' by appellant from which any reasonable inference could be drawn that he had no concern for the safety of his companions who were riding with him in the car at the time of the accident."

It is singularly noted further in the *Brown* case that the court held: "It is also true that *'acts such as exhibit a conscious indifference to consequences, make a case of constructive or legal willfulness.' Bedwell* v. *DeBolt, supra* (1943), 221 Ind. 600, 607, 50 N. E. 2d 875." (Our emphasis.)

However, in the *Brown* case the court held that there was no evidence to show or from which a reasonable inference could be drawn that appellant had knowledge that a truck was approaching the other side of the hill or that he realized that an injury would probably result from his speed at the time he approached the curve where the accident happened and the court further said that for the appellant to have been guilty of wanton or willful misconduct he must have intentionally proceeded into the curve with a reckless indifference to the consequences, knowing that a condition existed from which, because of his conduct, an injury to his guests would probably result, and again, cited *Bedwell* v. *DeBolt, supra.*

The *Brown* case was reversed and the judgment award was set aside.

The case of *Kahan* v. *Wecksler, supra,* is an action brought in Indiana where the collision and damage occurred in the state of Illinois and was brought under the Illinois guest statute, which is very similar to ours.

In that case the defendant-appellant was familiar with the road on which he was driving, knew there was a curve to the left and it was at that point that the collision occurred. The appellant did not properly negotiate the curve and the automobile crashed into an electric light standard and appellee sustained personal injuries.

This court, in passing on the Illinois statute as to what was a wanton act, said that:

"In *Lake Shore & M.S.R.R. Co.* v. *Bodemer* (1892), 139 Ill. 596, 606, 29 N. E. 692, the court quoted with approval from Thompson on Negligence as follows: *'What degree of negligence the law considers equivalent to a willful or*

*wanton act is as hard to define as negligence itself, and in the nature of things, is so dependent upon the particular circumstances of each case as not to be susceptible to general statement.'* And again in *Bernier* v. *Illinois Central Ry. Co.* (1921), 296 Ill. 464, 470, 129 N. E. 747, said: 'Whether an act is willful or wanton is greatly dependent upon the particular circumstances of each case. Where the omission to exercise care is so gross that it shows a lack of regard for the safety of others it will justify the presumption of willfulness or wantonness.' And again in *Jeneary* v. *Chicago and Interurban Traction Co.* (1923), 306 Ill. 392, 397, 138 N. E. 203, the court said: 'Ill will is not a necessary element of a wanton act. To constitute a wanton act the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure must be conscious, from his knowledge of the surroundings, circumstances and existing conditions, that his conduct will naturally and probably result in injury. *And intentional disregard of a known duty necessary to the safety of the person or property of another, and an entire absence of care for the life, person or property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness. . . .'* " (Our emphasis.)

This court, further, in discussing the matter of willful or wanton acts, said:

"Willful and wanton are not necessarily synonymous terms but they are frequently. When one is so obstinate as to be said to be taking the bit in his teeth he may be both willful and wanton. *When one by a continuous course of conduct seems to exercise no concern for others he may be both willful and wanton. When one is arbitrary he is usually both willful and wanton. . . .*" (Our emphasis.)

In that case the court affirmed the award of the jury.

Judge Sullivan of this court, so recently as 1970, said, in *Mazza* v. *Kelly* (1970), 147 Ind. App. 33, 258 2d 171:

"Plaintiff-appellant's complaint alleged that the injuries sustained were proximately caused by acts of wanton misconduct on the part of defendant-appellee. Under such circumstances, we must consider only the evidence most favorable to the plaintiff-appellant, to-

gether with all reasonable inferences which may have been drawn therefrom. *Unless this court can say that such evidence as a matter of law, would require reasonable men to conclude that the acts of defendant-appellee did not constitute wanton misconduct, we must reverse the decision and judgment below. Clouse v. Peden* (1962), 243 Ind. 390, 186 N. E. 2d 1; *Orey* v. *Mutual Life Insurance Co.* (1939), 215 Ind. 305, 19 N. E. 2d 547; *Smith* v. *Russell* (1969), 146 Ind. App. 157, 253 N. E. 2d 268; *Phares* v. *Carr* (1952), 122 Ind. App. 597, 106 N. E. 2d 242." (Our emphasis.)

In *Mazza* six young people, including the defendant's sister, went to Brown County State Park and before they arrived there the driver was warned to slow down.

When they left the park he was warned several times to slow down because of the curves and hilliness of the road, but did not heed the warnings and in attempting to execute a sharp curve turned the car over, injuring plaintiff's hand.

The case of *Clouse* v. *Peden, supra,* was discussed in this case, along with *Sausaman* v. *Leininger* (1957), 237 Ind. 508, 513, 514, 146 N. E. 2d 414, 417, 418, in which our Supreme Court, in discussing the rule, in part said:

" "* * * but it is not necessary that the driver should have any ill will toward the person injured or that he intend to cause or deliberately cause, the accident or injury in question. More precisely, it has been held that there is a distinction between the terms "willful" and "wanton" as used in such cases, in that "willful" implies intent or purpose, while "wanton" expresses a reckless disregard of consequences.' 60 C.J.S. Motor Vehicles § 258, p. 631. See: *Lafayette and Indianapolis Railroad Company* v. *Huffman,* 1867, 28 Ind. 287; *Terre Haute and Indianapolis Railroad Company* v. *Graham,* 1883, 95 Ind. 286.

"The rule has been stated by our courts as follows:

" 'Willful or wanton misconduct consists of the conscious and intentional doing of a wrongful act or ommission [sic] of a duty, with reckless indifference to consequences, under circumstances which show that the doer has knowledge of existing conditions and that injury will probably result.' *Becker* v. *Strater,* 1947, 117 Ind. App. 504, 506, 72 N. E. 2d 580, 581. See also: *Bedwell* v. *DeBolt,* 1943, 221 Ind. 600, 50 N. E. 2d 875."

The *Mazza* opinion further adheres to the rule that there must be some "perverse motive" on the part of the driver such as malice or willfulness, as related to the probability of injury to his guests, and that no such motive existed on the part of this appellant. With that the court concurred, and said:

"* * * We concur in the fact that to constitute 'willful or wanton misconduct' there must be a 'perverse motive,' in that the misconduct must be conscious and intentional and of such a nature that under the known existing conditions injury will probably result therefrom. However, as heretofore stated, this does not mean that the wrongful conduct of the driver must be motivated by malice, ill will, or intent to injure. Our statute uses the words 'wanton or willful' in the disjunctive. Therefore, it is sufficient to meet the condition of the statute if the conduct is *wanton*."

The *Mazza* opinion refers to and cites *Brueckner* v. *Jones* (1970), 146 Ind. App. 314, 255 N. E. 2d 535, and distinguished that case from the factual situation presented in *Mazza* and also in *Clouse* v. *Peden, supra.*

In *Brueckner,* Judge Sharp noted "that the guest statute test contemplates and requires establishment of a mental attitude on the part of the driver with respect to both his driving and his guest, which is adverse to the welfare of his guest." And the court held further:

"As to the third requisite element, the jury might reasonably have determined from the evidence in this case that appellee knew that his conduct subjected his guests to a probability of injury. *Appellant need not prove that appellee had actual knowledge that injury would probably result from his wanton misconduct. Rather, if the circumstances are such that reasonable men would know and conclude that their conduct under such circumstances entailed a probability of injury, then the driver of a motor vehicle is chargeable with this knowledge. Sausaman* v. *Leininger, supra.*" (Our emphasis.)

In *Brueckner* v. *Jones, supra,* it is interesting to note that the court stated:

"* * * And further, acts such as exhibit a conscious indifference to consequences, make a case of constructive or legal willfulness. * * *"

In *Brueckner*, the appellee was appellant's guest returning from Louisville after having taken appellee's husband to the Veterans Hospital. The day was cloudy and it was snowing. The accident occurred on a hilly, winding road with the visibility so bad as to obscure the path of the road. No complaint was made as to the operation of the car, which had "fishtailed" several times shortly before the collision. In this case the landmark case under the guest statute of *Bedwell* v. *DeBolt*, *supra*, was cited and discussed. Judge Sharp, in the *Brueckner* case sets out the guidelines laid down by the Supreme and Appellate Courts of this state for the trial courts to follow in evaluating guest cases, since 1937, in which an examination of authorities indicates:

> "a. An error of judgment or a mistake standing alone, on the part of the host, will not amount to wanton or willful misconduct.
> "b. The host must have manifested an attitude adverse to the guest, or of 'perverseness', in that the host must have shown he was indifferent to the consequences of his conduct.
> "c. The entire course of conduct of the host leading up to the accident must be considered.
> "d. The host must have had actual knowledge of danger confronting the guest."

The court in its holding compared *Brueckner* with the *Clouse* case, *supra*, in which he stated that in *Clouse* the driver had been asked to slow down and reminded of a prior accident at the same intersection, all of which admonition was disregarded. The court further held, in *Brueckner*, that there was a total lack of evidence in that case of any warning or the missing of any mental attitude and therefore the decision of the trial court was contrary to law and the cause was reversed and a new trial granted.

Again, in *Schwing* v. *McKibbin* (1970), 148 Ind. App. 222, 264 N. E. 2d 629, the court, in discussing what constituted "willful or wanton misconduct" said:

" '* * * there must be some 'perverse motive' on the part of the driver, such as malice or willfulness, as related to the probability of injury to his guests, and that no such motive existed on the part of this appellant. We concur in the fact that to constitute 'willful or wanton misconduct' there must be a 'perverse motive,' in that the misconduct must be conscious and intentional and of such a nature that under the known existing conditions injury will probably result therefrom. However, as heretofore stated, this does not mean that the wrongful conduct of the driver must be motivated by malice, ill will, or intent to injure. Our statute (§ 47-1021, *supra*), uses the words 'wanton or willful' in the disjunctive. Therefore, it is sufficient to meet the condition of the statute if the misconduct is wanton.' "

The facts in the *Schwing* case are that in the night time the plaintiff-appellee, riding in a car operated by the defendant-appellant on a narrow road, passed an automobile being driven by a former boy friend and another automobile driven by a former girl friend, despite repeated warnings of the appellee. Appellant lost control of her automobile and started to spin. The parties discussed and relied on the *Mazza, Brueckner* and *Clouse* cases hereinabove referred to and again Judge Sharp in this opinion discussed the cases and held there was sufficient evidence from which a jury might properly find a mental attitude present on the part of the driver with respect to both her driving and her guests which was adverse to the welfare of the guests, and which was contrary to *Brueckner*.

There was evidence that warnings were given repeatedly by not just one but by all of defendant's passengers, which together with the sliding of the car, would justify a jury's conclusion that the defendant was conscious of her misconduct.

"* * * Such knowledge or consciousness may be obtained not only through the use of the driver's faculties but as well from information conveyed to him in the nature of warnings by others." Citing *Bedwell* v. *DeBolt, supra,* and other cases.

Judge Sharp further distinguished between the *Brueckner* and the *Mazza* cases and held that if there was any distinction to be drawn between the two cases it must necessarily be one of degree and not one of kind. He further discussed the oral argument of appellant's counsel in which they noted the variances of length of time of the misconduct, the number of warnings, the number of guests voicing said warnings, to be found in *Mazza* vis-a-vis this case, and all of which he determined were distinctions of degree. The court further held that such variances were not fatal to the judgment below; that many plurals enunciated by Judge Sullivan in *Mazza* are not to be construed as essential to a finding of 'perverseness,' in that they must always be present; rather, said plurals are used to emphasize the magnitude of the misconduct and to show that such misconduct was clearly within the holding of *Clouse* v. *Peden, supra,* wherein the demands of a guest are sufficient to advise a driver of his misconduct.

In *Butcher* v. *Hull* (1970), 147 Ind. App. 686, 263 N. E. 2d 548, which is a guest case wherein the driver of the automobile was found to be guilty of wanton or willful misconduct under the guest act in failing to see a T intersection and colliding with a tree some 40 to 50 feet out in a field located in a continuation of the continuation of the southbound lane of Warren Street, the court discussed the definition of wanton misconduct. Further, the driver was never warned in any manner and the passenger had no fear of the driver's operation of the motor vehicle.

The court discussed *Brueckner* v. *Jones, supra,* stating in its discussion that the defendant-appellant was granted a new trial on the ground that the necessary mental element essential for a judgment favoring plaintiff under the Guest Statute was missing. The facts in this case were compared by the court to the cases in *Brueckner* and that "there must be a 'perverse motive' in that the misconduct must be conscious and intentional and of such a nature that under the known existing conditions injury will probably result therefrom." The court

further held that the actions of the appellant might amount to an act of negligence under the surrounding circumstances but then the court failed to find any grounds to support a verdict of wanton action. And, further, that the evidence most favorable to the appellee and all reasonable inferences which could be drawn therefrom in the case before us failed to show that the accident was more than an error in judgment or a mistake. Plaintiff-appellee's favorable judgment was reversed and a new trial granted.

Much has been made of the landmark case of *Bedwell* v. *DeBolt, supra,* and we feel that it is entitled to some discussion.

Appellee, a passenger in appellant's car, suffered personal injuries when the automobile in which he was riding collided with a locomotive at a public highway crossing. A jury returned a verdict on which a judgment was granted against the appellant for $3,000.

The Supreme Court's first question for consideration was whether the trial court committed reversible error in overruling a demurrer to the appellee's amended complaint upon which the action was tried. The memorandum attached to the demurrer charged that the facts alleged in the amended complaint amounted to nothing more than negligence and were not sufficient to charge "wanton or willful misconduct" within the meaning of ch. 259, Acts 1937, § 47-1021, Burns 1940 Replacement § 11265, upon which the action was predicated.

In *Bedwell,* the amended complaint alleged the appellee was appellant's guest in an automobile operated by him at 40 miles per hour and without stopping or looking or slacking his speed appellant drove upon a railroad crossing with which he was familiar when a locomotive was proceeding up and over said crossing at two miles per hour and a flashing signal displaying red lights was in operation and clearly visible to him.

The complaint was in two paragraphs, the first being negligence and the second under the Guest Act.

The record disclosed evidence which was admitted without objection to the effect that appellant was warned of the danger which confronted him by the other occupants of the automobile in sufficient time to avoid the accident but made no effort to stop the automobile or reduce its speed.

The original "Guest Statute" was discussed and the court said it found itself in complete agreement with what was said by Blessing, C. J. when this case was before the Appellate Court of Indiana. (This will not be discussed herein, but will be discussed in the next case.) The court did, however, say that the word "wilful" may be used in a broader sense than the term "wanton" and the court was of the opinion that the meaning of the two words as used in the Guest Statute were closely synonomous.

The court further said:

" 'In determining what constitutes a 'wilful' or 'wanton' act, we subscribe to the view that it is not necessary to prove that defendant deliberately intended to injure the plaintiff; it being sufficient if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequences of his act was injury to the plaintiff. *Baines* v. *Collins* (1942), 310 Mass. 523, 38 N. E. (2d) 626, 138 A. L. R. 1123. See also the Restatement of Law on Torts, § 500, page 1293. And further, acts such as exhibit a conscious indifference to consequences, make a case of constructive or legal wilfulness. *Kahan* v. *Wecksler* (1938), 104 Ind. App. 673, 12 N. E. (2d) 998; *Jeneary* v. *Chicago & Interurban Traction Co.* (1923), 306 Ill. 392, 138 N. E. 203; *Reell* v. *Central Illinois Electric & Gas Co.* (1942), 317 Ill. App. 106, 45 N. E. (2d) 500. To hold one guilty of 'wilful' or 'wanton' conduct, it must be shown that he was conscious of his conduct and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries. *Murphy* v. *Snyder* (1939), 63 Ohio App. 423, 27 N. E. (2d) 152; *Bartolucci* v. *Falletti* (1942), 314 Ill. App. 551, 41 N. E. (2d) 777. Ill will is not a necessary element. *Bernier* v. *Illinois Cent. R. Co.* (1921), 296 Ill. 464, 129 N. E. 747, affirming 215 Ill. App. 454.

> " 'Knowledge of existing conditions on the part of the host is a consciousness of such conditions obtained through the exercise of his senses, or information obtained by warning through others.' " (Our emphasis.)

The court held that had the jury been permitted to determine the issues presented by the second paragraph of answer the verdict might have been for the defendant.

The judgment was reversed with directions to sustain appellant's motion for a new trial and further proceedings.

It appears to us that our Supreme Court has very well clarified the Guest Statute in the case of *Buroker* v. *Brown* (1961), 241 Ind. 421, 172 N. E. 2d 849.

This case went to the Supreme Court on petition to transfer from this court under § 4-215, Burns 1946 Replacement.

Appellee's complaint for damages was in two paragraphs, in which first paragraph he alleged he was a passenger for hire and his injuries were the result of negligence in the operation of the automobile by appellant; the second paragraph alleged that appellee was a guest in appellant's automobile and appellant drove his automobile in a wanton or willful manner, resulting in the appellee's injury.

A verdict was awarded by the jury for the plaintiff-appellee in the sum of $25,000. The only error assigned and argued on appeal was that the verdict of the jury was not sustained by sufficient evidence.

The facts and evidence in support of the verdict are that the appellant Buroker and appellee Brown and a third party were serving in the armed forces at Fort Knox. Appellee Brown and the third party made arrangements with the appellant to drive them to their home in Ohio.

Appellant was driving a 1953 Chevrolet when, at a point about 60 miles northeast of Louisville, on Indiana State Road 3 at 2:15 P. M. appellant wrecked the automobile.

All three men were riding in the front seat and appellee had

been dozing most of the time but woke up as they were going through the town of Deputy, Indiana, and noticed the speedometer showed a speed of 85 to 90 miles per hour. The evidence conflicts as to speed; however, appellee's testimony is that the car was driven at the sustained speed of 85 to 90 miles per hour from the time he first noticed the speed to the place of collision, which occurred about two miles beyond the town of Deputy.

Appellant testified he was not familiar with the road and kept a close watch on both the speedometer and the road. The highway was very winding and had recently been resurfaced with blacktop, but was "wavy" and not smooth and there was a drop-off at each edge of the pavement of from two to four inches at the berm. The pavement was generally dry, but there was ice and snow on bridges and shady places. Immediately prior to the collision appellant drove across a bridge and into a curve in the highway where, in appellant's words, "it seemed like it was a slick place." At this place the car first went off the pavement, then almost immediately came back on the pavement where it skidded sideways down the road for about 300 feet. Other witnesses testified that the car went off the pavement onto the berm of the left side of the highway where it traveled about 140 feet, making deep tracks in the soft berm, before it went down a six to eight foot enbankment where it hit a utility pole which was about 8″ in diameter; and broke out a section of the pole about 10′ in length and continued to travel another 100 feet carrying a section of the pole with it, turning over one or more times before it came to rest. The car was completely demolished.

The Supreme Court said:

"The question we must determine is whether the facts as set forth above are sufficient to sustain appellee's charge that appellant was guilty of wanton or wilful misconduct in the operation of the automobile."

Appellant, as cause for appeal from the adverse judgment relied primarily upon the decision of the Supreme Court in the case of *Brown* v. *Saucerman, supra.* However, in the *Brown* case the Supreme Court by an equally divided opinion on applicability of the Guest Statute (§ 47-1021) denied liability. Consequently, the judgment of the trial court which had denied liability, was affirmed. Appellant asserts first that although the decision in the *Saucerman* case was by a divided court, the trial court in the case at bar was bound by the "prevailing opinion" of this court in the *Saucerman* case. And the appellant asserted that the facts in the *Saucerman* case were much stronger in favor of the injured party than in this case.

Our Supreme Court held that appellant's argument was error, in both counts. The court being equally divided upon the issue as to whether or not the Guest Statute was applicable to the facts in that case, because of the equal division affirmed the judgment of the trial court and there is no prevailing precedent which can be drawn from that case with regard to the application of the Guest Statute in this case. The court further held that appellant had erroneously assumed that the alleged prevailing opinion in the *Saucerman* case rests upon the assumption that at the time of the collision the appellant in that case was driving at a speed of from 70 to 80 miles per hour and that this excessive speed was the proximate cause of the collision. However the evidence regarding speed is limited to that of an officer who examined the car the next day and merely estimated the speed of the car from the damage done to be "better than 65 miles per hour."

In fact, the alleged prevailing opinion upon which appellant relied states specifically that the testimony regarding speed was of no probative value.

The court further said that although the facts in the *Saucerman* case may have been such there was a difference of opinion as to whether as a matter of law the driver of the car

operated the same with conscious disregard for the safety of its occupants and thus required a reversal of the trial court which had denied liability, that the same was not true in the case before it. (*Buroker* v. *Brown*) Here a verdict of liability was returned. The court then continued to set out the evidence of the driving of the car as we have hereinabove set forth.

Our Supreme Court further said:

> "Next we examine the ruling precedent of this court as stated in the Saucerman case, *supra* (237 Ind. 598, 602, 607, 608), and the Bedwell case, *supra* (221 Ind. 600, 606-607), as applied to the facts in the case at bar. We quote with approval the rules and propositions of law set forth in the alleged prevailing opinion in the Saucerman case. In that case this court at page 602 stated the law as follows:
>
> " 'Willful or wanton misconduct consists of the conscious and intentional doing of a wrongful act or omission of a duty, with reckless indifference to consequences, under circumstances which show that the doer has knowledge of existing conditions and that injury will probably result.' (Citing authorities.)
>
> "The burden was upon appellee herein to show by a preponderance of the evidence that appellant was conscious of his conduct, '. . . and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries.'
>
> "Also, at page 607 this court said:
>
> " 'We adopt the rule as stated by the Wyoming Supreme Court in *Meyer* v. *Culley, supra,* at page 94 of 241 P. 2d:
>
> " ' "While it is generally true that mere speed of itself does not constitute 'wilful mis-conduct' yet there may be a point at which the speed became so excessive that the danger of injury to a guest was probable at such extreme speed and that this might constitute 'wilful mis-conduct.' Needless to say the circumstances appearing in each case must rule this point." '
>
> "Also, at page 608 this court stated:
>
> " 'We recognize that "when one by a continuous course of conduct seems to exercise no concern for others he may be

both wilful and wanton." *Kahan* v. *Wecksler* (1938), 104 Ind. App. 673, 678, 12 N. E. 2d 998, 1000.

. . . . .

" 'It is also true that "acts such as exhibit a conscious indifference to consequences, make a case of constructive or legal wilfulness." *Bedwell* v. *DeBolt, supra* (1943), 221 Ind. 600, 607, 50 N. E. 2d 875.'

"In the case of *Bedwell* v. *DeBolt, supra,* at pages 606, 607, this court stated:

" 'The question then arises as to the meaning of the words "wanton and wilful misconduct," as used in the above act. On this phase of the case we find ourselves in complete agreement with what was said by Blessing, C. J., when this case was before the Appellate Court of Indiana. (47 N. E. 2d 176). We, therefore, adopt as our own the following language employed by him:

" ' "Blashfield has defined 'wanton misconduct' as 'the intentional or wanton disregard of the safety of others, and is manifested by conduct which is of such a character as to indicate the autoist's indifference to the consequences of his acts.' The same author defines 'wilful misconduct' as 'the intentional doing of something which should not be done, or intentional failure to do something which should be done, in the operation of the automobile, under the circumstances tending to disclose the operator's knowledge, express or implied, that an injury to the guest will be a probable result of such conduct.' Blashfield, Cyc. of Automobile Law & Practice, Permanent Ed., Vol. 4, § 2322, pp. 109 and 110.

. . . . .

" ' "In determining what constitutes a 'wilful' or 'wanton' act, we subscribe to the view that it is not necessary to prove that defendant deliberately intended to injure the plaintiff; it being sufficient if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the 'natural and probable consequences' of his act was injury to the plaintiff. . . .' " ' "

Our Supreme Court, in conclusion, stated that when it applied the ruling precedent of that court as stated in the above cited cases to the facts of the *Buroker* case they could not say as a matter of law that the speed at which the appellant was driving was not so extremely excessive under the attend-

ing circumstances; that injury to the occupants of the car was not a natural and probable consequence of appellant's intentional misconduct. They further held that, in fact, such misconduct, if true, might reasonably have been considered as an invitation to catastrophe.

The court, therefore, concluded that the facts there in evidence, together with reasonable inferences which may be drawn therefrom may be sufficient to sustain the verdict.

Defendant-appellee in his brief cites and discusses many of the cases cited by appellant in her brief and reply brief, and which we have considered in the light of the contentions of each of the parties in arriving at our decision in this cause, without considering the materiality, if any, as to which party or parties cited the case or cases.

There is evidence that defendant-appellee's decedent, Jerry D. Hancock, was most familiar with the intersection of Long Avenue and the Penn Central Railroad tracks and the warning devices established for the warning and protection of the general public using the highway in crossing the tracks; that there was a regulation, State Highway, octagonal stop sign erected on the east side of Long Avenue and south of the three railroad tracks of the Penn Central line, which intersected Long Avenue at right angles; that he was acquainted with the cross buck warning located south of the three railroad tracks; that he was acquainted with the bell which rang as the train approached and continued to cross the public highway and which was located on the metal pole on which the cross buck was fastened; that he frequently visited in the home of the decedent Robert Eugene Cheek which was at the south end of Long Avenue and when leaving to return to his home traveled north up Long Avenue, crossing the Penn Central tracks at their intersection with Long Avenue.

The court is of the further opinion that it is only logical and must necessarily be inferred that one so using Long Avenue at its intersection with the railroad tracks as often as the decedent, Hancock, did would necessarily have knowledge

that trains did pass in either direction on the center and north maintracks at high rates of speed of 70 to 75 miles per hour without slowing down to pass through the town of Osceola, and thereby created a danger to persons and vehicles using Long Avenue and crossing the tracks.

Plaintiff-appellant's amended complaint alleged that her decedent's death was sustained as a proximate result of acts of willful or wanton misconduct on the part of Jerry D. Hancock.

Said amended complaint further alleged that Jerry D. Hancock was guilty of willful or wanton misconduct in driving said Ford Ranchero on said railroad crossing in the path of said westbound train without stopping at the approach thereto in compliance with the stop sign placed on the east side of Long Avenue on the north [sic] edge of the tracks, when he knew said stop sign was there and the westbound train approaching from the east on the westbound main line was plainly visible to him.

A person operating a motor vehicle on a public highway is required to use his mental faculties at all times while so operating the motor vehicle. From the record before us pertaining to Mr. Hancock as to his activities and work and home life we can infer if not accept the fact, that he was a man of normal intelligence and therefore should have been familiar with all the area surrounding the railroad crossing in question and its attending dangers. It can further be inferred that he wantonly failed to use his mental faculties for the safety of his passenger, Cheek.

Under such circumstances, we must consider only the evidence most favorable to the plaintiff-appellant, Administratrix of the estate of Robert Eugene Cheek, deceased, together with all reasonable inferences which we may have drawn therefrom. Unless this court can say that such evidence, as a matter of law, would require reasonable men to conclude:

1. That the acts of Jerry D. Hancock, deceased, who is now represented by Homer Hamlin, Administrator of his

estate, did not constitute wanton or willful misconduct, we must affirm the decision and judgment of the trial court.

2. On the other hand if, after considering the entire course of conduct of Hancock leading up to the accident, this court can say such evidence, as a matter of law, would require reasonable men to conclude that such actions of Jerry D. Hancock, deceased, were such as to exhibit conscious indifference to consequences, then such acts make a case of constructive or legal willfulness and we must reverse the decision and judgment of the trial court. (*Mazza* v. *Kelly, supra; Bedwell* v. *DeBolt, supra;* and *Brueckner* v. *Jones, supra.*)

3. And, on the other hand, if the court can say that Jerry D. Hancock, deceased, acted in a continuous course of conduct without seeming to exercise concern for others, he may have been both willful and wanton and if this court can say such evidence as a matter of law would require reasonable men to conclude that the conduct of Jerry D. Hancock, deceased, was one of a continuous course of conduct which seemed to exercise no concern for others we must reverse the decision and judgment of the trial court. (*Brown* v. *Saucerman, supra.*)

4. We have heretofore discussed the necessity of the host having actual or constructive knowledge of a danger confronting his guest before there can be a recovery by the guest, or his legal representative, for the wanton or willful misconduct of the host. And as discussed heretofore, we are of the opinion that the host, Hancock, had, at least, a constructive notice of the danger at the Long Avenue crossing which was such that reasonable men would know and conclude that the conduct under such circumstances entailed a probability of injury to the guest, and the host driver, Hancock, was chargeable with this knowledge. (*Brueckner* v. *Jones, supra.*)

We now look at the rule which guides the court in its ruling on a motion for a directed verdict at the close of plaintiff's evidence.

The case of *Sparks* v. *Baldwin* (1965), 137 Ind. App. 64, 205 N. E. 2d 173, sets out the Indiana rule as to when a verdict

may be directed for the defendant: "Where the evidence is without conflict and is susceptible of but one inference and that inference is in favor of the defendant." This is a quote from the case of *Whitaker, Admr.* v. *Borntrager* (1954), 233 Ind. 678, 122 N. E. 2d 734, wherein our Supreme Court said:

> "When there is some evidence or legitimate inference supporting each material allegation of the complaint, the court will not weigh the conflicting evidence or inferences but will consider only the evidence and inferences that are most favorable to the party against whom the motion for a peremptory verdict is directed. [Citing cases.]
>
> "In determining whether a peremptory instruction should be given the court must accept as true all facts which the evidence tends to prove and draw, against the party requesting such instruction, all inferences which the jury might reasonably draw. [Citing cases.]"

This court, in *Cooper* v. *Teeters* (1969), 146 Ind. App. 150, 253 N. E. 2d 277, said as to the specification of error in the motion for new trial that the decision of the trial court in directing the jury to return a verdict for the defendants was contrary to law, and said further:

> ". . . In considering this allegation of error, it must be decided whether the evidence presented at the trial supported, without conflict, only one inference, which inference was in the favor of the defendants. *Whitaker, Admr.* v. *Borntrager* (1954), 233 Ind. 678, 122 N. E. 2d 734.
>
> "Furthermore, if any substantial evidence or reasonable inferences can be found which support the plaintiff's material allegations necessary to her recovery, then it was contrary to law to prevent that evidence from going to the jury by a directed verdict. [Citing cases.]
>
> "The rule has been repeatedly stated by this Court that a verdict should be directed only where there is a total lack of substantial evidence of probative value."

and cites *Sparks* v. *Baldwin, supra.*

Judge Buchanan of this court, in an opinion handed down December 6, 1971, *Mamula* v. *Ford Motor Company* (1971),

150 Ind. App. 179, 275 N. E. 2d 849, carefully touched on the matter of evidence to be considered in directing a verdict as construed in recent opinions which referred to "substantial evidence of probative value" and held that, in effect, the word "substantial" or "material" used before the word "evidence" in the motions for directed verdict was the thinking of the author of the opinion, and recited:

> "The quantum of evidence necessary for a plaintiff to avoid a directed verdict at the close of his evidence has ▮ been determined by our Supreme Court to be *any* evidence or legitimate inference therefrom tending to support at least one of the plaintiff's allegations.

Specifically, our Supreme Court held in *Hendrix* v. *Harbelis* (1967), 248 Ind. 619, 623, 230 N. E. 315, that:

> "'It is only where there is a *total absence of evidence* or legitimate inferences in favor of plaintiff upon the issues, or where the evidence is without conflict and is susceptible of but one inference and that inference in favor of the defendant, that the court may give a peremptory instruction. . . .' (Emphasis supplied.)
>
> * * *
>
> "When passing on a motion for a directed verdict, the court is merely called on to determine if there is *some* evidence of negligence on the part of the defendant which the jury is entitled to consider. *Jones* v. *Furlong* (1951), 121 Ind. App. 279, 97 N. E. 2d 369. *Where the evidence is such that the minds of reasonable men might differ,* or if the determination of negligence depends on conflicting evidence, then the question is for the jury. [Citing cases.]"

Judge Buchanan concluded:

> "Therefore, a directed verdict is proper only when the evidence is without conflict and is susceptible of but one inference in favor of the moving party. [Citing cases.]"

After having carefully read and examined the cases cited by the parties and other cases, of which cases some excerpts are set out in this opinion, we have applied the law as we have found it to be in guest cases in Indiana to the facts proved by the plaintiff-appellant in her case in chief in the case at bar. It is our opinion that reasonable men would necessarily

come to the conclusion under the evidence adduced in this trial that there existed, at least, an inference of willful or wanton misconduct on the part of Mr. Hancock.

There having been, at least, an inference of wanton or willful misconduct raised by plaintiff-appellant's evidence, the trial court committed reversible error in sustaining defendant-appellee's motion to withdraw the matter of liability from the jury and in granting judgment to defendant-appellee on the evidence at the close of plaintiff-appellant's evidence. The granting of the motion was contrary to law.

This cause, therefore, is reversed and remanded to the trial court for a new trial.

Hoffman, C. J. and Robertson, J., concur.

NOTE.—Reported in 277 N. E. 2d 620.